Luke D. Miller (OR Bar No. 175051)
MILLER BRADLEY LAW, LLC
1567 Edgewater St. NW
PMB 43
Salem, OR 97304
(800) 392-5682
luke@millerbradleylaw.com

Cameron T. Norris*
Daniel M. Vitagliano*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Attorneys for Plaintiffs Paul Terdal
and Terdal Consulting LLC*

* Admitted pro hac vice
† Supervised by principals of the firm
admitted to practice in VA

First Amended Complaint                1

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| PAUL TERDAL and<br>TERDAL CONSULTING LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SEJAL HATHI, individually and in her official capacity as Director of the Oregon Health Authority;<br>CLARE PIERCE-WROBEL, individually and in her official capacity as Director of the Health Policy and Analytics Division of the Oregon Health Authority;<br>NIKKI OLSON, individually and in her official capacity as Deputy Director of the Health Policy and Analytics Division of the Oregon Health Authority;<br>STACEY SCHUBERT, individually and in her official capacity as Director of the Office of Health Analytics of the Oregon Health Authority;<br>PIPER BLOCK, individually and in her official capacity as Research and Data Manager of the Office of Health Analytics of the Oregon Health Authority; and<br>KAREN HAMPTON, individually and in her official capacity as Oregon APAC Program Manager of the Oregon Health Authority,<br><br>Defendants. | Case No. 3:25-cv-1358-YY<br><br>**FIRST AMENDED COMPLAINT\***<br>Civil Rights Action (42 U.S.C. §1983)<br><br>**DEMAND FOR JURY TRIAL** |

---

\* Defendants have consented to Plaintiffs' filing this amended complaint. Fed. R. Civ. P. 15(a)(2).

First Amended Complaint                    2

1.      Paul Terdal has been advocating for access to safe mental and behavioral healthcare for 20 years. In that capacity, he sought data that the State of Oregon makes available to the public so he could conduct research as to the efficacy and incidence of gender-related medical treatments for children. But Defendants had decided that Oregon should take the position that these gender treatments are safe, effective, and indeed "life-saving," even though the medical evidence paints a far murkier picture. Defendants withheld data from Terdal to keep him from challenging that position. Defendants violated Terdal's First Amendment right to free speech and deprived Oregon families of information they need to make the best decisions they can for their children.

2.      The First Amendment's purpose is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). And the First Amendment's "central tenet" is that "the government must remain neutral in the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988).

3.      "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *NRA v. Vullo*, 602 U.S. 175, 187 (2024). Whenever "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978) (cleaned up).

First Amended Complaint                          3

4.    Regrettably, the Oregon Health Authority is violating these bedrock First Amendment principles.

5.    For 15 years, the Authority has maintained the Oregon All Payer All Claims Reporting Program. Under this program, the Authority collects health data for the purpose of better informing policymakers and the public. Oregon law requires the Authority to make this data available as a resource to empower consumers to make better medical decisions.

6.    The Authority has repeatedly fulfilled requests for its public use data files without issue, including more than 20 times over the past few years. It has released the data files to healthcare providers to identify care needs, to professors and students for research projects, to journalists covering billing practices and the availability of different services, and to consulting and analytic companies for various projects.

7.    In 2021, the Authority released data to Paul Terdal's consulting company for a research project concerning Medicaid coverage. Terdal later used the data to analyze the number and characteristics of children and adults who received chemical or surgical treatments for gender-identity disorders in Oregon. In 2024, Terdal undertook a year-long advocacy campaign, urging the Authority's Health Evidence Review Commission to reverse its endorsement of a particularly aggressive protocol of such treatments for children and sharing his analysis of Oregon's data with the media and state

First Amended Complaint                    4

legislators. Terdal's advocacy culminated in a lengthy exposé by the Lund Report, detailing how the Authority silenced concerns about the safety and efficacy of its recommended treatments for children with gender-identity disorders.

8.     So when Terdal recently requested public-use data files to study "gender affirming treatment prevalence, comorbidities, and outcomes," the Authority flagged his request as politically sensitive and subjected it to heightened scrutiny, inconsistent with the Authority's own rules and practices. As part of that heightened scrutiny, officials expressed disagreement with Terdal's prior analysis of child gender treatments in Oregon and his decision to share the analysis with the media and legislators. They acknowledged, however, that they had no legitimate basis to withhold the data from Terdal, having released it to others several times before.

9.     Yet still, the Authority withheld the data anyway, concocting a justification that releasing it would violate HIPAA. That argument was purely pretextual. If it were true, then each prior release of the data over the last 15 years violated HIPAA. But the Authority has never reported any such breaches of protected information, as required by federal regulations. The Authority's conscious failure to report those purported breaches would leave it subject to HHS enforcement and millions of dollars in civil penalties. The Authority's proffered HIPAA excuse is false and a pretext for the blatant viewpoint discrimination and retaliation against Terdal.

10.     By withholding the public-use data files from Terdal to skew public debate on the important issue of child gender treatments, the Authority is violating the First

First Amended Complaint                    5

Amendment. "'The best test of truth is the power of the thought to get itself accepted in the competition of the market,' and the people lose when the government is the one deciding which ideas should prevail." *NIFLA v. Becerra*, 585 U.S. 755, 772 (2018) (cleaned up) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). If the Authority disagrees with Terdal's analysis of its data and views on child gender treatments, "the remedy to be applied is more speech, not enforced silence." *Texas v. Johnson*, 491 U.S. 397, 419 (1989) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).

## PARTIES

11.    Plaintiff Paul Terdal is the managing member of Terdal Consulting LLC. He resides in Oregon.

12.    Plaintiff Terdal Consulting LLC is a consulting company based in Portland, Oregon.

13.    Defendant Sejal Hathi is the director of the Oregon Health Authority. She is sued in her official and individual capacities.

14.    Defendant Clare Pierce-Wrobel is the director of the Authority's Health Policy and Analytics Division. She is sued in her official and individual capacities.

15.    Defendant Nikki Olson is the deputy director of the Authority's Health Policy and Analytics Division. She is sued in her official and individual capacities.

16.    Defendant Stacey Schubert is the director of the Authority's Office of Health Analytics. She is sued in her official and individual capacities.

17.     Defendant Piper Block is the research and data manager of the Authority's Office of Health Analytics. She is sued in her official and individual capacities.

18.     Defendant Karen Hampton is the manager of the Authority's All Payer All Claims reporting program. She is sued in her official and individual capacities.

## JURISDICTION AND VENUE

19.     The Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343 because this action arises under the Constitution and laws of the United States.

20.     The Court has authority under 28 U.S.C. §2201 and §2202 and 42 U.S.C. §1983 to issue the relief sought.

21.     Venue is proper in this district under 28 U.S.C. §1391 because Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

### *Oregon's APAC Public Use Data*

22.     The Oregon Health Authority has maintained the Oregon All Payer All Claims reporting program since 2009. Under the APAC program, health insurers, healthcare service contractors that issue medical insurance, third-party administrators, pharmacy benefit managers, and other entities are required by law to report certain health care data. ORS 442.373(1); *see* ORS 442.372.

23.     APAC's purposes include "[a]llowing health care policymakers to make informed choices," "[e]valuating the effectiveness of intervention programs in improving health outcomes," "[c]omparing the costs and effectiveness of various treatment

First Amended Complaint                          7

settings and approaches," "[p]roviding information to consumers and purchasers of health care," and "[i]mproving the quality and affordability of health care and health care coverage." ORS 442.373(1).

24.     As part of APAC, the Authority collects, for example, "[h]ealth care claims and enrollment data"; "[r]eports, schedules, statistics or other data relating to health care costs, prices, quality, utilization or resources"; and "[d]ata related to race, ethnicity, disability, sexual orientation, gender identity and primary language." ORS 442.373(2)(b).

25.     The Authority is required by law to use the APAC data "to provide information to consumers of health care to empower the consumers to make economically sound and medically appropriate decisions." ORS 442.373(5)(a).

26.     The Authority maintains "a comprehensive health care information system using the data reported." ORS 442.373(7). Information disclosed through this system "[s]hall be available … as a resource to researchers, insurers, employers, providers, purchasers of health care and state agencies to allow for continuous review of health care utilization, expenditures and performance in this state." ORS 442.373(8). In the Authority's words, "APAC provides access to timely and reliable data essential to assess the cost of health care, improve quality, reduce costs and promote transparency." *All Payer All Claims Reporting Program*, OHA, perma.cc/Z4AU-5Z6V.

27.     The Authority's collection, storage, and release of healthcare data under APAC "is subject to the requirements of the federal Health Insurance Portability and Accountability Act." ORS 442.373(9). And when sharing APAC data, "[t]he Authority

First Amended Complaint                    8

shall comply with all relevant state and federal data privacy, security, and antitrust regulations, including … HIPAA." OAR 409-025-0160(1).

28.    The Authority provides APAC data in a "public use data set," which "include[s] de-identified member health information," or in "limited data sets," which "may include protected health information." OAR 409-025-0160(3), (4). Both sets are to be provided "in compliance with applicable Authority policies and state and federal rules, regulations, and statutes." *Id.*

29.    The public use data sets de-identify individuals by using a unique person ID and unique member ID. Information in the data sets includes person and member IDs, patient age, patient sex, provider, patient diagnosis, procedures performed, prescriptions filled, dates of service, cost of procedure or prescription, amount insurance covered, and copay amount, among other things.

30.    Requestors seeking public use data files complete a "Public Use Data File Application (APAC-2)" and transmit any required payment. OAR 409-025-0160(3)(b). As part of the application, requestors provide contact information and a "project summary," including the project title, a brief description of how the data will be used, an anticipated timeline, and the purpose of the project (research, treatment, payment, or health care operations). *Application for Public Use File: APAC-2*, OHA, perma.cc/R8R4-HQF3.

31.    The Authority must approve or deny a request within 30 days of receipt. OAR 409-025-0160(3)(c).

First Amended Complaint                    9

32.     If the Authority approves the request, the requestor must execute a data use agreement. OHA, *Oregon All Payer All Claims Database (APAC): An Overview* 4 (2018), perma.cc/A4P2-7L8T (*APAC Overview*).

33.     The Authority may deny a request if the requestor has previously violated a data use agreement with the Authority, if the request does not sufficiently explain the proposed use of the data, if the request violates state or federal law, or if the requestor does not transmit required payment. OAR 409-025-0160(3)(d). If it denies a request, the Authority must provide written notification stating the reason for the denial. OAR 409-025-0160(3)(e)(A). The requestor may appeal the denial by requesting a "contested case hearing." OAR 409-025-0160(3)(e)(B).

34.     Obtaining limited data sets requires a more extensive process, including an additional application form (APAC-3) and review by a data-review committee.



*APAC Overview* 16-17; *see* OAR 409-025-0160(4).

First Amended Complaint                    10

*Terdal and Terdal Consulting*

35.    Paul Terdal is a lifelong Oregonian. He is a liberal Democrat and has been actively involved in supporting Democratic candidates through canvassing and fund-raising and as a policy volunteer.

36.    Terdal has 25 years' experience in operations, product development, engineering, and IT systems implementation. He has a BA in physics from Reed College, an ScM in engineering from Brown University, and an MBA from Yale School of Management. While studying at Yale, Terdal was a John M. Olin fellow in the study of markets and regulatory behavior and a teaching assistant for graduate-level courses in statistics and in decision analysis and game theory.

37.    Terdal formed Terdal Consulting in 2012. Terdal Consulting provides management consulting, policy analysis, and economic analysis services for both public and private organizations, including government agencies, for-profit corporations, and non-profit organizations. Terdal Consulting primarily serves biopharmaceutical and biotechnology companies. It has also done work for the National Council on Disability, an independent federal agency.

38.    Terdal Consulting's projects in the healthcare industry have included strategic and operational planning for clinical trials; regulatory filing process for biologics license applications; GMP data migration; information systems design, development,

First Amended Complaint                11

validation, and governance; master data management for direct materials; supplier qualification; design of organizations for drug development; and analysis of Medicaid coverage.

39.     Terdal is a longstanding and well-known Oregon health consumer advocate. He has lauded Oregon's historical emphasis on evidence-based medicine.

40.     A father of two children with autism, Terdal spearheaded efforts leading to the Oregon Health Evidence Review Commission's approval of Medicaid coverage for behavioral interventions for autistic children, which followed the rigorous review of medical evidence required under Oregon's system. Terdal has been a fierce advocate for the rights and needs of children with mental and behavioral health needs for the past two decades. He has fought to make treatment options available to those children, and he has also fought to protect children by, for example, spearheading the creation of the Behavior Analysis Regulatory Board and numerous other statutes designed to protect the health and safety of children receiving treatment. Through his advocacy he has consistently sought to inform and empower families.

41.     Terdal also worked with HERC (and its predecessor, the Health Resources Commission) on evidence-based guidelines for application of mental health parity to rehabilitative care, EPSDT (early and periodic screening, diagnostic, and testing), waiver renewal, and use of QALY (quality-adjusted life year) methods.

First Amended Complaint                      12

42. Terdal has also led the development and advocacy for Oregon laws governing health insurance, behavioral health licensing, and disability rights, as well as revisions to Oregon's Section 1115 Medicaid waiver.

***Terdal's Use of APAC Data and Related Advocacy***

43. In December 2021, Terdal Consulting submitted an APAC-2 data request as part of a research project for the National Council on Disability. The project concerned QALY methods by state Medicaid agencies in coverage decisions for prescription drugs and other healthcare services. The Authority approved the request and provided Terdal Consulting with 2019 public-use data files. The Authority did not require Terdal Consulting to execute a data use agreement restricting its use of the data.

44. In 2023, in response to a surprising increase in the number of autistic children expressing gender-related distress, Terdal conducted independent study regarding the treatment of gender-identity disorders. Terdal learned that there was surprisingly little publicly available information about the prevalence or outcomes of treatments for these disorders, despite intensive and heated policy debates.

45. In 2023 and 2024, Terdal used the 2019 public-use data files to conduct a preliminary analysis of treatment of gender identity disorders in Oregon.

46. Terdal's analysis found that 7,585 individual patients had received insurance, Medicaid, or Medicare reimbursement for services with a gender-identity related diagnostic code. Those patients included more than 150 children who were prescribed

First Amended Complaint                    13

puberty blockers, 33 children who had mastectomies or breast reduction surgeries, and two children who had hysterectomies with removal of fallopian tubes and ovaries.

47.    In December 2023, Terdal discovered that the Authority had commissioned an evidence-based report on "Receipt of Gender-affirming Medical Interventions" by the Oregon Health and Science University's Center for Evidence-based Policy but had cancelled it and withheld it from the medical experts on HERC. A draft copy of the report revealed that the analysts had been unable to "identify any [systematic reviews] with extractable data on gender affirming medical interventions among adolescents and youth" and had expressed concern about this "paucity of data" to make treatment recommendations.

48.    Troubled by his findings, Terdal sent a letter to HERC in January 2024, challenging HERC's decision to endorse a 2022 guideline of the World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* (WPATH 8), as the accepted standard of care in Oregon. The guideline, among other things, abolished all age limits for pharmaceutical treatments, chest surgeries, and surgeries to remove genitals. Terdal expressed concern that HERC did not follow its transparent, evidence-based guideline process and did not consider medical evidence for safety and effectiveness, creating a strong risk that children may endure overly intensive treatment without a well-established diagnosis and suffer lifelong consequences. Terdal requested a formal medical technology assessment of "gender affirming" treatment and development of an evidence-based guideline. In

First Amended Complaint                    14

Oregon, many believe that pharmaceutical and surgical treatments are necessary to treat children who express gender-related distress, that without medical intervention these children will commit suicide, and that these treatments are safe. OHSU researchers had found that there was in fact little or no evidence to this effect. In Terdal's view, HERC needed to be honest and candid with the public, and its decision to adopt the WPATH guideline without noting the weakness of the evidence was misleading.

49.    Terdal reiterated these points in oral and written testimony in HERC meetings in January and March 2024. Terdal also had a call with HERC leadership to discuss these matters in March 2024.

50.    In response to Terdal's letter, HERC staff promptly began to reconsider its position on the safety and efficacy of certain child gender treatments.

51.    Terdal's advocacy prompted discussions among HERC Commissioners and Authority staff acknowledging that "gender affirming" treatment is not evidence based and may be dangerous. HERC leadership consistently raised concerns about WPATH 8 but were ultimately overruled by Authority officials.

52.    HERC Chair Devan Kansagara wrote to fellow commissioners:

> I have been thinking about that Paul Terdal testimony a lot. … I know I expressed a lot of hesitation about HERC getting involved … , but it is remarkable that few medical organizations are engaging in this and maybe it is the right thing to do to really clarify what is known and not known.

First Amended Complaint                    15

53.    HERC Director Jason Gingerich wrote to the then-deputy director of the Authority's Health Policy and Analytics Division, "Everyone I am talking to agrees there is little evidence … ."

54.    Gingerich also wrote to the Authority's government relations contact:

> I'm a little uncomfortable highlighting WPATH 8.0 so prominently. …
>
> As you may be aware, WPATH has come under scrutiny recently, including an op ed in the New York Times last weekend, as well as some leaks from WPATH's internal chats that call into question how evidence-based its recommendations are.
>
> There are also activists very focused on this issue (testifying at 3 meetings, … filing public records requests). …
>
> Given all this it may be worth consider[ing] removing the reference to WPATH 8 … .

55.    Margaret Cary, the Authority's behavioral medical director of the Oregon Health Plan, wrote to HERC leaders and Authority officials:

> Are there risks and concerns about covering GnRH [Gonadotropin-Releasing Hormone] agonists for youth diagnosed with gender dysphoria? *YES!* There is also a paucity of research on the long-term impacts of GnRH agonists as GAC [gender-affirming care] in adolescents: … unknown impact on brain, metabolism, and bone development, potential increase in PCOS [Polycystic Ovary Syndrome]. … I have already seen in my last ~10 yrs of providing care and conversations around GAC that the eagerness to ensure access has sometimes resulted in skipping over steps and not considering the developmental and holistic context of the youth.

56.    Kansagara wrote (emphasis added):

> I read that Times article last week and was dismayed to learn that an NIH funded study (to the tune of $10 million) went unpublished

First Amended Complaint                    16

for political considerations. Ultimately suppression, obfuscation, and misrepresentation of evidence will paradoxically do more harm than good to the communities in need. … *I shudder to think that providers conducting shared decision making with their patients about these really complex decisions don't have a full set of information to work from. We can do better as a medical community.*

57.    In May 2024, Terdal submitted a written comment to HERC, reiterating his request for a formal medical technology assessment and development of an evidence-based guideline and again urging HERC to withdraw its endorsement of the WPATH guideline. Terdal explained that there are now several new, high-quality systematic reviews with extractable data on "gender affirming" medical interventions for adolescents and youth for HERC to reference, including the Cass Review from the United Kingdom. *See The Cass Review: Independent Review of Gender Identify Services for Children and Young People* (2024), perma.cc/J3BE-M9HB.

58.    In June 2024, HERC leadership met with Authority staff. As the Authority summarized, "Members of the HERC leadership group expressed discomfort with the adoption of WPATH 8.0 in the HERC guideline and asked to reference several other guidelines as examples that could be used. After consultation with [Authority] leadership, no such recommendation was made."

59.    In July 2024, Terdal published an article accusing Oregon health officials of "ignoring evidence" and "shortcutting medical ethics" regarding the safety and efficacy of gender-identity treatments. Terdal wrote that "[b]ased on my analysis of state data, hundreds of children have received some combination of puberty-blockers, cross-

First Amended Complaint                17

sex hormones, and surgeries," even though "[n]one of these procedures have gone through clinical trials to demonstrate their safety and effectiveness." Paul Terdal, *Progressives' Drive for Equity Is Leading Them Astray on Medical Gender Transition for Minors*, Nat'l Rev. (July 2, 2024), archive.ph/WcL66.

60.     In October 2024, HERC leadership again met with Authority staff. As the Authority summarized (emphases added),

> at two meetings of staff and HERC leadership, *four of the leadership team members expressed concern about the lack of change in the guideline in response to leadership's request*. While they noted the issues raised in testimony and their previous request to list several guidelines, they also expressed additional concern due to a recent New York Times article showing that a leading researcher suppressed publication of results of a study showing no significant change in mental health status from puberty suppression. At these meetings, *HERC leadership requested changes to the guideline*, though they acknowledged the social and political environment. The two options discussed included deleting the WPATH reference, or listing examples of guidelines in addition to the WPATH reference.

61.     On November 4, 2024, Terdal's efforts reached Authority director Sejal Hathi. Authority officials convened an urgent meeting with Hathi "on HERC and gender-affirming treatment" just two days before Authority officials were scheduled to meet with HERC leadership. In preparation for the meeting, DeMars emailed Hathi a seven-page memorandum documenting Terdal's advocacy and HERC's reconsideration of "gender affirming" treatment. DeMars copied Nikki Olson, deputy director of the Authority's Health Policy and Analytics Division, and others on the email. The November 4 meeting agenda provided:

First Amended Complaint                18

> <u>Three options under consideration</u> (to be discussed at 11/6 meeting with GR/HERC leadership & staff)
>
> 1. Modify current HERC guideline to include other standards of care (for example, WPATH 8.0, X, X)
> 2. Eliminate the guideline note
> 3. Keep the guideline note, but eliminate the WPATH references *(**note:** this hasn't been discussed by HERC leadership, and wasn't in the background doc)*

62.    Later that month, Terdal submitted another written comment to HERC, reiterating his requests for a formal medical technology assessment and development of an evidence-based guideline and for HERC to withdraw its endorsement of WPATH 8. Terdal cited reports of researchers withholding data and findings that do not support aggressive and invasive treatments for gender-identity disorders and other evidence undermining WPATH's guideline. *See, e.g.*, Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), archive.ph/h9aDn; *Research into Trans Medicine Has Been Manipulated*, Economist (June 27, 2024), archive.ph/wJCI7; Brief of Alabama as *Amicus Curiae* Supporting State Respondents, *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) (No. 23-477), perma.cc/W7R4-U8TX.

63.    That same day, at a public HERC hearing, DeMars issued a statement that read, in part:

> HERC has received public comments at recent meetings expressing concern about HERC's [endorsement of] WPATH 8.0 Standard of Care … requesting HERC to create an evidence-based guideline on gender affirming treatment … and to remove the reference to the WPATH 8.0 guideline … . [Authority] staff and leadership have

been meeting to decide on next steps. We are taking the time necessary to identify the best path forward … to ensure that members have access to appropriate gender-affirming treatments.  We will proceed, guided, as always, by [the Authority's] core values, including health equity, integrity, partnership and transparency.

64.    In December 2024, the Lund Report published an article detailing many of the above events. The article described the internal debates at the Authority over how the WPATH guideline affects children and how HERC skirted its standard approach to evidence-based medicine when considering child transgender treatments—all prompted by Terdal's advocacy stemming from his analyses of APAC public use data. Thomas, *Oregon Officials, Experts Grappled Behind the Scenes with Youth Gender-Affirming Care Guideline*, Lund Report (Dec. 12, 2024), perma.cc/8TAK-PUEW. The article described Terdal challenging the WPATH guideline and included his preliminary analysis of the 2019 public use data file: "Terdal analyzed Oregon health insurance claims data from 2019 and found that 7,585 patients received gender-affirming care that year. Of those, roughly 700 had some kind of surgery, 35 of whom were under 18. Over 100 patients, all under 18, were prescribed puberty blockers, according to the analysis." *Id.* OPB republished the article. Thomas, *Oregon Officials, Experts Grappled Behind the Scenes with Youth Gender-Affirming Care Guideline*, OPB (Dec. 12, 2024), perma.cc/UJ9S-X55K.

65.    In short, Terdal's past use of APAC public-use data files led to significant public advocacy challenging and undermining the Authority's position on gender-identity treatments, all of which was covered by the Lund Report and OPB.

First Amended Complaint                         20

***Terdal's 2025 APAC-2***

66.    Shortly thereafter, in February 2025, Terdal emailed the Authority, expressing interest in a research project using Oregon APAC public-use data sets. He asked the Authority to confirm that it had public-use data sets for medical and pharmacy claims available through 2020, as stated on the Authority's website.

67.    An APAC analyst confirmed that "the currently available public use data sets include medical and pharmacy claims data from 2011 to 2020" and are "available at no cost."

68.    On February 18, Terdal, on behalf of Terdal Consulting, submitted an APAC-2 request for public-use files with medical and pharmacy claims data for 2011 to 2020. He titled the project "Gender Affirming Treatment prevalence, comorbidities, and outcomes" and designated its purpose as "research." He described the project as follows:

> Oregon has required commercial insurers to cover gender-affirming treatment since 2012 (through bulletin INS 2012-1), and Medicaid coverage was added in 2015 – making Oregon a pioneer in access to care.
>
> Despite this long history, there is a striking lack of reliable information about prevalence of treatment, patient profiles (such as age of diagnosis and treatment, and comorbidities) – and patient outcomes (such as need for follow-up care, and improvement in comorbidities such as anxiety and depression).
>
> Oregon's role as an early pioneer makes it an excellent case study – and Oregon's APAC Public Use File provides an excellent resource.

First Amended Complaint                    21

Public use files for 2011 through 2020 will show the baseline prevalence (pre-mandate) and adoption of these services, and how the patient profile has evolved over time.

The APAC data will also show the other medical and behavioral health conditions that patients are being treated for – before, during, and after gender-affirming treatment. For instance, are patients able to reduce use of services and medications for anxiety and depression after treatment? Are there significant side effects that occur commonly after treatment?

The findings from this research will be published, and will contribute to generalizable knowledge that will help both policy makers and other researchers.

Upon submitting his APAC-2, Terdal offered "to meet … to discuss this project, and how we will use the data."

69.    The Authority immediately "flagged" the request because the topic related to "Monitoring Federal Changes and any Impacts on Oregon." The Authority's system is configured to automatically flag any external requests that concern "REALD/SOGI" (race, ethnicity, language, or disability/sexual orientation or gender identity), "immigration," "gender affirming care," and "reproductive health."

70.    On February 20, Piper Block, research and data manager of the Authority's Office of Health Analytics, emailed a group of nine senior Authority executives to "alert" them to Terdal's APAC request. The group included Stacey Schubert, director of the Authority's Office of Health Analytics; Claire Pierce-Wrobel, director of the Au-

First Amended Complaint                22

thority's Health Policy and Analytics Division; and Karen Hampton, the APAC program manager, as well as some executives who have no direct involvement in the APAC program.

71. Block objected to providing the data to Terdal because she disagreed with his prior analyses and his decision to share them with the media and legislators. She complained that Terdal's analyses were "shared with legislators such as Representative Yunker and also shared with the Lund Report."

72. Block singled out Representative Dwayne Yunker, a vocal critic of "so-called 'gender-affirming' procedures" with "no sound evidence showing medical benefits." *Letter from Dwayne Yunker, Oregon State Representative, to Pam Bondi, United States Attorney General* (Mar. 24, 2025), perma.cc/3YBH-C8VD.

73. Despite her objections, Block acknowledged that "[s]ince we have historically provided this specific public use file to requestors, we most likely need to provide it in this context." She explained that the APAC team would require Terdal to sign a new version of the data use agreement for public-use data files, which included a provision requiring him to cite APAC as the source when publishing analyses from the data and to "suppress small numbers in summarized analyses." She also solicited "recommendations on additional actions" to take in its response to Terdal's request.

74. One executive, a senior policy analyst in the Health Policy & Analytics Division, added Olson to the email chain and said that he would discuss the request

First Amended Complaint                23

with the Authority's "internal Gender-Affirming Care Steering Committee." Block responded that the APAC team would "wait … to proceed with the request" and "let Mr. Terdal know that we are processing [it]."

75.     Another executive said she "share[d] some of [Block's] concerns regarding reporting the information accurately" but was so unfamiliar with the APAC program that she inquired "what would be included in a Public Use File of APAC data?" Block explained that the public-use data file "does **not** have any direct personal identifiable information … and meets HIPAA confidentiality standards for public use files because it does not include geographic identifiers either such as zip code or county." Hampton added that "[t]hese files (2020) have existed since early 2022 at the latest and been released several times (data is out)." She explained that "as existing data that has been released, we cannot redact or refuse to share the data now."

76.     On February 24, having not received a response, Terdal followed up to confirm receipt and processing of his request. He again offered to discuss the project. The APAC analyst confirmed that the Authority "received [the] request," is "currently processing it," and "will provide … further information soon."

77.     On February 25, the APAC analyst forwarded the response to Block and Hampton. Block advised that she was "working on our agency response to this request" and she would "take over communications" with Terdal "for the more sensitive phase of this request" because it "is a difficult one to be a part of."

First Amended Complaint                    24

78. Terdal followed up again on March 3. The APAC analyst told him that he would receive an update "sometime this week."

79. On March 7, Block abruptly shifted her story. She advised Terdal for the first time that the existing APAC public-use data files for 2011 to 2020 "do not meet HIPAA de-identification standards" and so "[t]he APAC team must first address these issues before we can share the existing [public use data file] with requestors." Block claimed the Authority needed to "[c]hange full admission date, discharge date, service date, and prescription date to year only" and "[c]hange age for anyone 90 years or over to a single category (90+)," per 45 C.F.R. §164.514(b)(2)(i)(C), and "[o]mit unique person ID and unique member ID to decrease potential for re-identification of individuals," per §164.514(b)(2)(ii).

80. On March 9, Terdal replied to Block, opining that the APAC public-use data files "are actually in compliance" with HIPAA. As to omitting unique person and member IDs, federal regulations specifically permit the reidentification process the Authority used. *See* §164.514(c). And as to dates and ages, the Authority would be in the clear if it had determined that there was little risk of identifying individuals with the data. *See* §164.514(b)(1). Terdal explained that commercially available insurance claims databases—Optum Insight, Konodo Health, and Atlas, among others—provide similar information as the APAC public-use data files, including some exact dates.

81. Terdal added that if the APAC public-use data files in fact did not comply with HIPAA, then the Authority would need to notify HHS, the individuals whose data

First Amended Complaint                          25

was exposed (including himself), and the news media, since the data files had already been released many times. *See* §§164.400-164.414; *Health Information Privacy: Breach Notification Rule*, HHS, bit.ly/409an9G. Terdal observed that since the data files cover 10 years' worth of data and contain records on nearly every Oregonian, this would be the largest personal health-information data breach in Oregon history by far.

82. Terdal requested a meeting to discuss the Authority's purported concerns and "confirm our path forward."

83. The Authority never responded to Terdal's March 9 email.

84. In response to a later email that Terdal sent Hathi, Pierce-Wrobel, and Schubert about his APAC-2 request, Pierce-Wrobel reiterated the Authority's proffered justification that the Authority "does not have a [public-use data file] that meets applicable privacy requirements that can be shared."

85. To date, the Authority has refused to produce the public-use data files to Terdal.

86. The Authority's APAC data requests webpage currently states that "we are not currently fulfilling new data requests as our staff is at capacity." *APAC Data Requests*, OHA, perma.cc/5G47-6SRG.

### The Authority's Viewpoint Discrimination and Retaliation Against Terdal

87. Since 2020, the Authority has received 25 APAC-2 applications for public-use data files. The Authority fulfilled each request before Terdal requested data for his research project on gender treatments earlier this year.

First Amended Complaint                    26

88.    Approved APAC-2 applications during this period include the following requestors and projects, among others:

- Nordic Consulting to develop algorithms to identify comorbidities and health outcomes;

- Iris Telehealth to identify high costs in healthcare spending and suboptimal outcomes;

- Professor Caroline Kolman of the University of Pittsburg to be given to engineering students to create predictive analytics;

- Southern Oregon Orthopedics to identify a need for an additional spinal surgeon in southern Oregon;

- Icon Health to connect patients with high value orthopedic providers to improve clinical outcomes;

- Professor Timothy Coffin of George Mason University to use pharmacological data to enhance an artificial intelligence tool to guide clinical decisions on antidepressant use and symptom remission;

- A student at the University of Buffalo to track wildfire health outcomes and costs;

- A student at Oregon Health and Science University to study healthcare pricing;

- A Colorado correspondent of Kaiser Health News to cover hospital billing practices relating to emergency services for labor and delivery;

- Journalist Matthew Ponsford, researching articles about Oregon's investment in applied behavior analysis services and its effectiveness as a therapy to treat autism;

- A student at the University of Mannheim to analyze how elements of cost-sharing affect utilization of health care, pharmaceutical, and dental services;

First Amended Complaint                    27

- A research engineer at Oregon Health and Science University for a paper on calculating quality measures; and

- Quartet Health to evaluate commercial opportunities with payer partners operating in Oregon.

89. Contrary to its representations, the Authority does not sincerely believe that the APAC public-use data files violate HIPAA's de-identification standards.

90. Per federal regulations, HIPAA's de-identification standards can be satisfied in one of two ways. First, by having someone with particularized "knowledge" and "experience" "determin[e] that the risk is very small that the information could be used … to identify an individual" and document the "methods and results of the analysis that justify such determination." 45 C.F.R. §164.514(b)(1). Second, by removing certain identifiers and not having "actual knowledge that the information could be used … to identify an individual." §164.514(b)(2). Relevant here, those identifiers include "[a]ll elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, [and] date of death," and "all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older." *Id.*

91. As to the first option, it is not possible to identify individuals with the information provided in the APAC public-use data file. While the file includes some identifiers that would be prohibited under the second option, it entirely omits many identifiers that the second option would permit, including healthcare providers, healthcare facility name, payor name, and the first three digits of the patient's zip code.

First Amended Complaint                    28

92.    As Block explained, "In terms of what is in the public use file – it is claim-level diagnoses and procedures with no geographic identifiers. It does **not** have any direct personal identifiable information, such as name, address, or member IDs, and meets HIPAA confidentiality standards for public use files because it does not include geographic identifiers either such as zip code or county." And as Hampton confirmed, "neither individuals [n]or providers are identified directly or indirectly in the data." "The protective feature (for confidentiality) in the public use file is what is <u>not</u> included. The data in public use files is statewide. This means there is no city, zip or county information. Someone in Oregon had this procedure. Provider information is not included."

93.    Block and Hampton both have the "knowledge" and "experience" to determine that any "risk" of identification "is very small." 45 C.F.R. §164.514(b)(1)(i). Documentation of their determination would put the Authority in compliance with HIPAA. *See* §164.514(b)(1)(ii).

94.    As to the second option, while the APAC public-use data file does not omit all identifiers listed in the regulation—namely, full admission and discharge dates and ages over 89—several commercially available insurance claims databases produced under this option include some full dates, including claim dates and prescription dates. And the Authority did "not have actual knowledge that the information could be used … to identify an individual," 45 C.F.R. §164.514(b)(2)(ii), given Block's and Hampton's understanding of the data files.

First Amended Complaint                              29

95.    As to Block's claim that the Authority must omit unique person ID and unique member ID, regulations expressly authorize the "re-identification" process that the Authority utilized to create the unique person ID and unique member ID used in the APAC public-use data files. *See* §164.514(c).

96.    The Authority has already released the 2011 to 2020 APAC public-use data files many times before. If those data files do not meet HIPAA de-identification standards, as the Authority claims, then the Authority would have needed to notify the individuals whose data was exposed, the media, and HHS within 60 days of discovering the breach. 45 C.F.R. §§164.404, 164.406, 164.408. More than 60 days have passed since Block told Terdal that APAC public-use data files do not comply with HIPAA standards, yet the Authority has not issued any such notice. *See, e.g.*, *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, HHS, bit.ly/4nGMsZp. If the Authority's data files do not satisfy HIPAA, then the Authority's failure to provide the notices required by federal regulations exposes it to HHS enforcement and millions of dollars in civil penalties. 45 C.F.R. §§160.402, 160.404. The Authority would not take that risk if it sincerely feared HIPAA noncompliance.

97.    The Authority's proffered reasons for withholding the APAC public-use data files from Terdal are instead false and a pretext to discriminate against him for his viewpoint and retaliate against him for his protected speech.

98.    The Authority's proffered concerns about HIPAA de-identification standards are false, a pretext, and a sham to cover its unlawful motive to discriminate against

First Amended Complaint                                30

Terdal based on his viewpoints about gender treatments and to retaliate against him for his public advocacy and sharing his analysis of APAC data with the media and legislators.

99.    Authority officials recognized there is no legitimate basis to withhold the APAC public use data file from Terdal. As Block acknowledged, "Since we have historically provided this specific public use file to requestors, we most likely need to provide it in this context." And as Hampton confirmed, "as existing data that has been released, we cannot redact or refuse to share the data now."

100.    The Authority's failure to comply with its obligations to report the purported breach of protected health information confirms that the Authority's proffered reasons for withholding the APAC public use data file from Terdal are false and pretextual.

101.    The Authority's failure to release the APAC public data set has caused Plaintiffs immense and ongoing harm. By failing to release the data, the Authority has successfully prevented Terdal from engaging in constitutionally protected speech. He has lost his First Amendment freedom.

102.    It has stymied Terdal Consulting's business development and potential projects for prospective clients interested in Oregon's health care system.

103.    Terdal Consulting is in communication with several advocacy associations that are actively hiring consulting companies to analyze medical data. Terdal Consulting

First Amended Complaint                        31

can pursue engagements with these associations to analyze Oregon's APAC data once it has the data in hand.

104.    Terdal Consulting's proposed research project would be groundbreaking and provide new insights into gender treatments. It would enable Terdal to write journal articles and give conference presentations to showcase his expertise in data and policy analysis. For example, Terdal has been invited to give a conference presentation to a national association of autism service providers about use of the APAC data to study autism services. Journal articles or conference presentations from Terdal Consulting's proposed research project likely would receive significant international attention, attracting new clients and leading to significant new projects.

105.    Many of Terdal Consulting's pharmaceutical clients are particularly interested in employing research methods that analyze "real world evidence." Terdal Consulting's proposed research project would give Terdal greater experience and enhance his skills in analyzing data, which he could use to help his clients leverage this and other data for development of pharmaceutical products.

## CLAIMS FOR RELIEF
### COUNT I
### Viewpoint Discrimination
### 42 U.S.C. §1983; U.S. Const. Amends. I, XIV

106.    Plaintiffs repeat and reallege each of the prior allegations.

107.    The Free Speech Clause of the First Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment, prohibits the government

First Amended Complaint                    32

from "abridging the freedom of speech." U.S. Const. amend. I; *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

108.    "The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019).

109.    The government discriminates based on viewpoint "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 829 (1995).

110.    Defendants subjected Plaintiffs' APAC-2 request to heightened scrutiny, contrary to their own established rules and process, because the request related to "gender affirming care" and because of Terdal's advocacy challenging the Authority's position on child treatments for gender identity disorders.

111.    Defendants stopped producing APAC public-use data files out of concern of Terdal's prior analysis, his public advocacy, and his questioning the safety and efficacy of child gender treatments.

112.    Defendants' purpose for withholding APAC public-use data files is unlawful viewpoint-based discrimination.

113.    Defendants' actions are unconstitutional per se. At a minimum, they are not narrowly tailored to achieve a compelling government interest and thus fail strict scrutiny.

114.    Defendants' conduct was recklessly and callously indifferent to Plaintiffs' federally protected rights.

First Amended Complaint                              33

115. Plaintiffs suffered immense damages because of Defendants' intentional viewpoint discrimination.

## COUNT II
### Retaliation
### 42 U.S.C. §1983; U.S. Const. Amends. I, XIV

116. Plaintiffs repeat and reallege each of the prior allegations.

117. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).

118. Terdal's sharing his analysis of gender-identity treatments in Oregon to the media and legislators and his public advocacy challenging HERC's endorsement of WPATH 8 for child gender treatments are constitutionally protected speech.

119. Defendants' withholding the APAC public-use data files from Plaintiffs is a materially adverse action that would chill a person of ordinary firmness from continuing to publicly challenge the Authority over child gender treatments.

120. Defendants' withholding the APAC public-use data files from Plaintiffs has caused Plaintiffs other harm, including hampering prospective business and other business-development opportunities for Terdal Consulting.

121. Defendants retaliated against Plaintiffs and would not have withheld the APAC public-use data files from them but for Terdal's constitutionally protected speech.

First Amended Complaint                    34

122.    Defendants' proffered concerns about HIPAA de-identification stand-ards are false, a pretext, and a sham to cover the unlawful motive to discriminate against Mr. Terdal because of viewpoints he expressed about youth gender treatments and to retaliate against him for his public advocacy and sharing his earlier analyses with the media and legislators.

## PRAYER FOR RELIEF

123.    Plaintiffs respectfully ask this Court to enter judgment in their favor and against Defendants and provide the following relief:

A. A declaration that Defendants' withholding of the APAC public-use data files violates the First Amendment;

B. An injunction prohibiting Defendants from withholding the APAC pub-lic-use data files from Plaintiffs;

C. Compensatory damages;

D. Punitive damages;

E. Nominal damages;

F. Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws; and

G. All other relief that Plaintiffs are entitled to.

## DEMAND FOR JURY TRIAL

Pursuant Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

First Amended Complaint                            35

Dated: October 14, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*

Luke D. Miller (OR Bar No. 175051)
MILLER BRADLEY LAW, LLC
1567 Edgewater St. NW
PMB 43
Salem, OR 97304
(800) 392-5682
luke@millerbradleylaw.com

Cameron T. Norris*
Daniel M. Vitagliano*†
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Attorneys for Plaintiffs Paul Terdal
and Terdal Consulting LLC*

* Admitted pro hac vice
† Supervised by principals of the firm
admitted to practice in VA